FOURTH DISTRICT—NOVEMBER, 1910.    557

Eimers v. C., C., C. & St. Louis Ry. Co., 158 Ill. App. 557.

## Albert Eimers, Appellee, v. Cleveland, Cincinnati, Chicago & St. Louis Railway Company et al., Appellants.

1. DRAINAGE—*rights of railroad as to surface water.* A railroad company has the right to drain from its right of way any surface waters which naturally come thereon, to a natural watercourse going through the right of way; subject, however, to the limitation that it has no legal right to drain even mere surface waters to any natural watercourse other than the one or ones to which they would naturally flow by way of their own natural water shed.

2. DRAINAGE—*limitation of owner's right as to surface waters.* No landowner has the right to divert surface waters or the flow of watercourses from their natural channels and thereby overflow the lands of another without rendering to him proper compensation for his damages by reason of such overflow.

3. DRAINAGE—*when railroad liable for diversion of watercourses, etc.* Where a railroad company diverts the flow of a watercourse or the flow of mere surface waters and conducts them through a ditch or otherwise through a natural water barrier to a point where they overflow the land of another, the company will be liable for such damages as result therefrom; and the fact that such waters are first conducted into a natural watercourse leading to or through the lands damaged will not change this liability provided such waters cause such natural watercourse to overflow its banks to the damage of such other landowner.

4. DRAINAGE—*when duty of railroad to construct culverts under embankments.* While there is no law to compel a railroad company to build a culvert under its embankment to allow mere surface waters to flow in their usual way to their natural watercourses, yet it is the duty of such company to provide culverts if by virtue of its construction such waters are diverted and backed upon the land of another; the duty of the railroad company is to prevent the overflowing of the land of another, and it is liable for a diversion caused by it which results in an overflow and consequent damage.

5. DRAINAGE—*when particular phrase in instruction in action for causing overflow will not reverse.* The use of the expression "by the construction of a railroad and borrow pits in question caused water to be led into Hinch branch," etc., instead of the use of more specific language, such as "by means of the pipes and the tile," *held*, not material, as the language used included that suggested.

6. VERDICTS—*when not disturbed.* Where the evidence is conflicting, after two verdicts in favor of the plaintiff the Appellate Court will be slow in setting aside a verdict as manifestly against the weight of the evidence or as the result of prejudice.

7. INSTRUCTIONS—*when. upon right of recovery appropriate.* In an action to recover damages for overflow of land resulting from the diversion of surface water, an instruction is proper which tells the jury that if they "believe from the evidence that the plaintiff has proven his allegations as set forth in the amended declaration, or any count thereof then" the jury should find the defendant guilty, such an instruction being neessarily predicated upon an appropriate declaration.

8. INSTRUCTIONS—*upon extent of proof of declaration essential, proper. Held,* that an instruction is proper which tells the jury that it is not necessary for the plaintiff to prove the facts set out in every count of his declaration but that the plaintiff is entitled to recover if he proves by a preponderance of·the evidence the allegations contained in any one count, such an instruction necessarily being predicated upon the existence of one good count.

9. INSTRUCTIONS—*when need not refer to proof by preponderance of evidence.* It is not necessary that each and every instruction shall repeat that the plaintiff's proof to entitle him to recover must be by a preponderance of the evidence; if the jury are told this requirement of the law in one instruction the absence thereof in other instructions will not reverse.

Action in case. Appeal from the Circuit Court of Madison county; the Hon. B. R. BURROUGHS, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed April 9, 1910. Rehearing denied October 27, 1910.

**Statement by the Court.** The Cleveland, Cincinnati, Chicago and St. Louis Railway Co. and Chicago, Indianapolis & St. Louis Short Line Railway Co. appeal from a judgment for the sum of $2,000 recovered by Albert Eimers against appellants in the Circuit Court of Madison county, in an action in case for damages for alleged negligence of appellants in the construction of their road-bed whereby appellee's lands and crops were flooded with water and damaged. The said lands of appellee are the E. half of N. E. qr. and S. W. N. E. qr. of Sec. 5, and N. W. N. W. qr. Sec. 4 all in T. 5 N., R. 7 W. of 3d P. M., about two and three quarter miles southwest of Worden, and are bottom lands, eighty to one hundred acres of which are cleared·for farming lands, the remainder being in timber. Appellant's road was constructed in 1904, and runs within about three quarters of a mile

and south of appellee's farm in a straight line, for about four miles after passing said lands, a little bit south of due northeast. It is a double track road having an embankment from sixteen to twenty-seven feet high at the points complained of in this suit. The earth to construct this embankment was taken from alongside the road, thereby making large borrow pits on each side, varying from fifty to two hundred and fifty feet in width and of the depth of two to fifteen feet. Beginning about sixteen hundred feet east of the crossing of this road with the east fork of Hinch Branch the road was constructed east for more than two miles through a natural divide, the natural surface of which at its easterly end was about one hundred feet higher than the natural surface of plaintiff's lands. The line of this water shed was such that the waters to the north of the dividing line flowed towards Cahokia Creek. The waters to the south, that are complained of by appellee, flowed to Silver Creek through various channels and could not, unless diverted, reach appellee's lands. The railroad runs through the southerly portion of this water shed and the waters that naturally fell upon a considerable portion of this shed and which had theretofore drained southerly into Silver Creek, were by the road collected into borrow pits on each side thereof and diverted and carried in a southwesterly direction along the borrow pits into the east fork of Hinch Branch a tributary of Cahokia Creek. This branch then flows westerly for about a half mile into the main Hinch Branch and thence northwesterly through plaintiff's tract in section 4 and empties into Cahokia Creek about five hundred feet north of said tract. Cahokia Creek then flows in a southwesterly direction through the northeast tract of appellee's land in said section 5 and thence continues in a southwesterly course past the remainder of appellee's farm. The main Hinch Branch and the east fork thereof are very small streams crossing the railroad almost at right angles about eighteen hundred

feet apart and a little over a mile southeast of appellee's land, the main branch being west of the fork. The source of the main branch is about three quarters of a mile southeast of the railroad, and the source of the east fork is not more than one quarter of a mile southeasterly of the railroad. About a mile and a quarter east of the crossing of the east fork of Hinch Branch, the Wabash railroad crosses under the appellant's railroad tracks at a sharp angle, the Wabash running in a direct line a little west of due northeast. The L. & M. Railroad also crosses the right of way of appellant in a similar manner about one quarter of a mile east of the Wabash and runs about parallel with the Wabash for more than a half mile north and south of appellant's road. The dumps of these roads there are from about two to four feet high, while appellant's dump at the Wabash is about twenty-seven feet high. The Illinois Traction System, or the McKinley Road, also crosses under appellant's tracks some six hundred feet east of the L. & M., and on the public road running south of Worden at what is known as the "McKinley Arch." From the McKinley road west to the east fork of Hinch Branch, the borrow pits on both sides of the appellant's road are connected with tiles or cast iron pipes buried beneath the surface of the ground, these tiles or pipes being buried one on each side of appellant's road-bed under the embankments of the Wabash and L. & M. roads and under the various public road crossings. These tiles or pipes are eighteen inches in diameter on both sides of the appellant's road at the crossings of the two railroads and on the north side of the McKinley Road crossing, and twelve inches in diameter on the south side at the McKinley crossing. At all other crossings west of the Wabash up to the east fork of Hinch Branch these tiles or pipes on each side of the road are twenty-four inches in diameter. At this branch and crossing the base of the dump of appellants at right angles is a 36 inch pipe, and at the crossings of the main branch in like manner

is a 60 inch pipe. From the McKinley road east on the north side of appellants' dump the borrow pits are all connected with tile or pipe of different sizes, the east 1,700 feet being a nine inch tile buried under the surface of the ground. There are no tiles or culverts or other means for the water to pass north or south through the dump of appellants within the distances above named, except the said cast iron pipes at the two small branches.

The declaration contained six counts, stating in different ways that appellants by means of its said embankment, borrow pits, ditches, tiles and pipes collected great quantities of water on both sides of its said right of way, a great deal of which otherwise never could have reached appellee's lands by natural drains; and unlawfully and improperly conducted said water from its natural flow through the cuts in the natural water barriers a westerly direction along the sides of its right of way into said small branch and thence to plaintiff's lands, in such quantities that the capacity of the branches was exceeded and their banks overflowed; and that thereby large swales were cut and washed in plaintiff's said lands, and his soil washed away, and sand and other foreign debris washed thereon, and his said lands and his crops of 1905 and 1906 were greatly damaged, etc. At the close of all the evidence the court denied appellants' motion for peremptory instructions, as well as their motion for a new trial, and entered judgment on the verdict in favor of plaintiff against defendants in the sum of $2,000, after appellee had entered a *remittitur* of $1,480.

It is insisted here by appellants (1) that they had the right to drain from the right of way any surface waters which naturally came thereon to a natural watercourse going through the right of way; (2) that a railroad company has the same rights as any other owner of land, and may obstruct the mere flow of surface waters by its embankments; (3) that the verdict

is the result of passion, prejudice or mistake and does not support the judgment; (4) that appellee's three instructions given by the court are erroneous.

WISE & KEEFE, and SPRINGER & BUCKLEY, for appellants; L. J. HACKNEY, of counsel.

TERRY & GUELTING, for appellee.

MR. JUSTICE DUNCAN delivered the opinion of the court.

First.    Appellants' first proposition is true with the limitation that no landowner has the legal right in Illinois to drain even mere surface waters to any natural watercourse other than the ones to which they would naturally flow by way of their own natural water shed.    No landowner has the right to divert surface waters or the flow of watercourses from their natural channels and thereby overflow the lands of another without rendering to him proper compensation for his damages by reason of such overflow.    Where a railroad company diverts the flow of a watercourse or the flow of mere surface waters and conducts them through a ditch or otherwise through a natural water barrier to a point where they overflow the land of another, the company will be liable for such damages as result therefrom.    The fact that such waters are first conducted into a natural watercourse leading to or through the lands damaged will not change this liability provided such waters cause such natural watercourse to overflow its banks to the damage of such other landowner.    The E. St. L. & C. Ry. Co. v. Eisentraut, 134 Ill. 96, and 34 Ill. App. 563; The C. & A. R. R. Co. v. Glenney, 118 Ill. 487 and 28 Ill. App. 364; The J., N. W. and S. E. R. R. Co. v. Cox, 91 Ill. 500; Graham v. Keene, 143 Ill. 425.    In the case of Fenton and Thompson R. R. Co. v. Adams, 221 Ill. 201, our Supreme Court has stated the conditions under which barriers to the natural flow of water may be removed

and standing surface waters drained onto or through the servient estate. On page 211 of that opinion the court says: "If an owner have upon his land when the surface is in its natural state, a basin in which water accumulates, and from which, when filled and overflowing, the water passes in a particular place where the rim of the basin is lower than elsewhere, and there flows through a depression to and upon the land of another, the natural outlet and natural course for that water is through that low place in the rim and through that depression and the owner may lawfully cut down the rim and deepen the depression upon his own land so as to entirely drain the basin and cause the water therefrom to pass through the depression to and upon the land of his neighbor, if the neighbor's land be low enough to entirely drain the basin, even though the amount of water flowing through this depression to the servient heritage is thereby increased, and water which would be retained in the basin if the rim and depression were left as in a state of nature and never reach the land of the neighbor, is thereby cast upon his heritage." And again on page 213 the court says: "A proprietor of land may change the course of a natural watercourse within the limits of his own land if he restores it to the original channel before the lands of another are reached, provided in changing the course of the stream he does not cast upon the lands of an adjoining proprietor water which would not in a course of nature flow upon such adjoining premises." These authorities clearly establish the doctrine that if one proprietor by tearing away natural barriers carries water upon the land of another which has fallen upon an entirely different water shed from that into which it is carried, the former proprietor will be liable to the latter for all damages caused by such unnatural flow of water.

It is said by appellants that while the embankments of the L. & M. and Wabash which were built before appellants' road, constituted barriers to the direct

flow of the water east of those embankments through appellee's lands before appellants' embankment was built, yet they were not natural barriers, and that it cannot be successfully maintained that appellants did not have the right with the consent of those roads, to place tile therein and thereby drain its own lands into east fork. Even if this be conceded, we do not understand that appellee is complaining of all the waters that came from between these two roads. As to those waters between these two other roads that flowed into the main Hinch Branch before appellants' road was built, of course it can make no difference now whether they reached appellee's lands by the main branch or by east fork as the result would be practically the same. The water complained of by appellee that falls between those two roads as we understand it falls on lands lying north of the public road on the township line, and the elevations given on the plat show that these waters naturally flow north and against appellants' embankment. The same is true of the waters falling just east of the L. & M. and north of the township line. Mr. Sheppard, the civil engineer who testified for appellee, states that none of these waters ever naturally flowed into Hinch Branch or Cahokia Creek. It does not seem to us that the plat in evidence in any wise contradicts him. As to the waters east of the L. & M. and south of the township line the evidence shows that they reach Silver Creek through the small stream running south and near the east side of the L. & M. road, and the plat strongly corroborates it though no elevations are given there.

Second. It is contended by appellant that it had no legal duty to put culverts under its embankments, so that the water would flow away; but that it had a right to obstruct and hold by its embankments the mere flow of surface waters. While this principle is only indirectly involved in this case, yet as a principle of law it is not sustained by our Supreme Court. The complaint of appellee in this case is that appellants ob-

structed the natural flow of surface water and also
diverted and carried it into his lands, and that such
water in a course of nature never could have reached
his lands. There is no law to compel appellant to put
culverts under its embankments to allow mere surface
waters to flow in their usual way to their natural
course, provided that in diverting said water it reaches
its natural watercourse on the land of appellants and
is not backed onto the land of another. It is held in
Chic., P. & St. L. Ry. Co. of Ill. v. Reuter, 223 Ill. 387,
that if a railroad company by the negligent or im-
proper construction of its railroad embankment causes
the land of an adjacent owner to be overflowed and
damaged by surface waters that it will be liable for
the damage of each overflow as in case of a nuisance.
In other words such a structure as will so obstruct the
natural flow of surface waters as unnecessarily to over-
flow the land of another and cause unnecessary damage
that reasonable and practical skill and engineering
would obviate, is not a legal or permanent structure,
but may be treated as a nuisance and will subject the
railroad company to endless litigation until the nuis-
ance is abated. O. & M. Ry. Co. v. Wachter, 123 Ill. 440.

Third. By the testimony of Charles E. Sheppard, a
civil engineer, and witness for appellee, it appears
that the natural waters that fell on four hundred acres
of land on the north side of appellants' embankment,
and on one hundred and fifty acres of land south of the
embankment, that never could have reached the lands
of appellee by their natural watercourses, were by
means of appellants' embankments, borrow pits and
tiles collected against the sides of the embankment
and diverted and carried into the east fork of Hinch
Branch. On the north side of the embankment these
continuous borrow pits all connected by tiles or pipes
extended for more than two and one half miles east of
this branch. Practically the only escape for these wat-
ers on both sides of the embankment was through this
branch. When the waters on the north side over-filled

the borrow pits and backed up very high a portion of these waters would escape south into Silver Creek on the public road after first passing through the McKinley Arch. Many of appellee's witnesses state that the waters would back up so high that it would be two and three feet deep in the arch on the public road. This public road must be some higher than the natural surface of the earth there or it would not have those water pipes under its embankment. The elevations shown on the plat in evidence, admitted to be correct, show the natural surface of the earth at the side of this public road to be about four feet higher than at the surface at the Wabash crossing and about six feet higher than the bottom of the pipes under the Wabash embankment. These pipes must then have been submerged in water some seven to nine feet over their tops during these times of high water. The widest borrow pits are at the Wabash crossing and it is near a half mile from there back to the McKinley Arch. As the volume of water discharged westward depends upon the pressure and as pressure is measured by the heighth of the water, it can readily be seen that these two pipes under such conditions would discharge a very large volume of water to be carried by so small a branch. It must also be remembered too that the waters were also collecting from the north against this embankment west of the Wabash in addition to the waters coming through the embankment of the Wabash and that the tiles or pipes west of the Wabash at the public road crossings were twenty-four inch pipes, and that the tile or pipe in the branch and connecting the waters of both sides of this embankment, is a thirty-six inch pipe. All this water too was in addition to that that nature had cut the branch to accommodate, and in high waters the branches would naturally receive all the waters from its own natural sources for which it had proper capacity. Many of appellee's witnesses followed this water flow for this whole two miles and a half east

of this branch during high waters, and down from there to appellee's lands.  They testify that the flow was continuous all the way to his lands, that the branch was higher than ever known, and that after the waters got down the steep grade in this branch from the railroad to the bottom lands where the grade was slight and the flow more sluggish, that the waters broke over on to plaintiff's lands, submerging as much as forty acres of his cleared lands at a time and causing the damages complained of.  Appellants insist that it is inconceivable that the water could come so far and in such volume through those pipes.  We are wholly unable to see what long distance has to do in slowing the flow or in lessening the volume of water.  Besides there are no pipes where these waters enter this branch.  The evidence of the plaintiff's witnesses is too voluminous to discuss in detail, there being thirty-five of them besides himself.  According to their evidence the embankment of appellants caused all or most all the damage to appellee, and while contradicted in many essential things by the fourteen witnesses for appellants, the best that could be said of it for appellants, is that this testimony is in hopeless conflict, and it is peculiarly a question for the jury to decide the questions of liability in this case.  We have studied with great care the theory of the appellants that plaintiff's damages and the ditches or swales cut across his lands were caused by the waters of Cahokia Creek breaking out over its banks near the present mouth of Pieper branch and flowing straight down south across Hinch Branch and thence southwest across plaintiff's lands to Cahokia Creek again.  Much of this evidence is circumstantial and to the effect that the corn and grass and other vegetation north of Hinch Branch where these swales start were bent in the direction of Hinch Branch, showing that the water flowed that way, and also by the further circumstances of drift wood and other debris being shown along there.  Much of the evidence is positive and is contradicted by as

much or more positive evidence by plaintiff. Many witnesses testify that appellee's premises were in about the same condition before appellant's road was built as on the day suit was brought. As many more contradict these statements. As to the circumstantial evidence which we always regard as very valuable, it is much weakened by the further evidence that just north of these swales and in their line on the north side of Hinch Branch there is at present another branch flowing out of the hills and the woods into Hinch Branch and also an old and former channel of Pieper branch that runs to or about the same point from the north, also emptying into Hinch Branch. As the slope of the country there is toward Hinch Branch from the north we do not feel justified in saying that the jury were not warranted in saying that very much of this debris and sign of waters flowing there were the result of natural waters coming down these channels from sources other than Cahokia Creek, and particularly so as the great wash and damages thereby are south of Hinch Branch. As to the amount of damages it is sufficient to say that the evidence of appellee's witnesses was ample to sustain the full amount of the judgment and much more. The evidence is also in hopeless conflict on this question. Appellee's witnesses fixed the damages to the cleared lands alone at about thirty dollars per acre, while a few of appellants' witnesses stated he was damaged some, but not nearly so much as the others fixed it, and several of appellants' witnesses would tend to show that he suffered no damages at all as appellants' embankment in no way damaged him. It is however shown by evidence from both sides that there are about ten acres or more of cleared lands there entirely ruined by these swales or washes, and that he had from thirty-five to fifty acres of corn almost entirely ruined in 1905 after it had matured and was shocked and that he about lost his crop in 1906 on account of overflows however caused. In view of the condition of the evidence, and

in further consideration of the fact that the plaintiff has had two verdicts in his favor on these facts, we do not feel warranted in saying that the verdict is manifestly against the weight of the evidence or the result of prejudice, etc.

Fourth.   There is no error in the giving of any of appellee's instructions.   By the first instruction the court told the jury, "If you believe from the evidence that the plaintiff has proven his allegations as set forth in the amended declaration or any count thereof, then you should find the defendant guilty."   And by the second instruction the jury were told that it is not necessary for the plaintiff to prove the facts set out in every count of the amended declaration, but that the plaintiff is entitled to recover if he proves by a preponderance of the evidence the allegations contained in any one count.   These instructions in substance have been many times approved.   St. L. A. & T. H. R. R. Co. v. Holman, 155 Ill. 21; C. & A. R. R. Co. v. Harrington, 90 Ill. App. 638; C. & A. Ry. Co. v. Hatfield, 109 Ill. App. 556; Central Ry. Co. v. Bannister, 195 Ill. 48; Donk Bros. Coal Co. v. Thil, 228 Ill. 233.   It is only necessary for plaintiff to prove one good count in a declaration to recover.   It is only necessary for him to prove the material allegations of any one count.   There is no objection that will serve appellant, to a court saying to the jury that he is entitled to recover if he proves all his allegations in any one count.   That is what said instructions require.   If he had limited the requirements to proving the material allegations, then it would have been necessary to inform the jury what were the material allegations without leaving them to settle the question as to what allegations were material.   A specific objection to the first instruction by appellants is that it does not require proof by a preponderance of the evidence.   Other instructions of appellants plainly told the jury that plaintiff was required to prove his case by the preponderance of the evidence.   It is not necessary to re-

peat this in every instruction given. Besides proving his case by the evidence "means no more nor no less" than proving it by the preponderance of the evidence. See case last cited, 228 Ill. 233. The third instruction of appellee is criticised by appellants because it uses the expression, "by the construction of a railroad and borrow pits in question caused water to be led into. Hinch Branch," etc., instead of saying "by means of the pipes and the tile." The pipes and tile may be properly considered a part of the railroad construction or borrow pits either. It took all of them to make the railroad structure and perhaps all of them to cause plaintiff's damages, if any. The jury could not have been misled thereby.

Finding no reversible error in this record, the judgment of the lower court is affirmed.

*Affirmed.*